1  PHILLIP A. TALBERT
   United States Attorney
2  MIRIAM R. HINMAN
   CHRISTOPHER S. HALES
3  Assistant United States Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone: (916) 554-2700
5  Facsimile:  (916) 554-2900

6

7  Attorneys for Plaintiff
   United States of America
8

9                  IN THE UNITED STATES DISTRICT COURT

10                 EASTERN DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,              CASE NO.  2:22-CR-00095-TLN

13                  Plaintiff,             PLEA AGREEMENT

14            v.

15  YVONNE GAIDE,

16                  Defendant.

17

18                        I.      **INTRODUCTION**

19       A.     **Scope of Agreement.**

20       The information in this case charges the defendant with a violation of 18 U.S.C. § 1343 – Wire

21  Fraud (Count One). This document contains the complete plea agreement between the United States

22  Attorney's Office for the Eastern District of California (the "government") and the defendant regarding

23  this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District

24  of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory

25  authorities.

26       B.     **Court Not a Party.**

27       The Court is not a party to this plea agreement. Sentencing is a matter solely within the

28  discretion of the Court, and the Court may take into consideration any and all facts and circumstances

PLEA AGREEMENT                              1

1 | concerning the criminal activities of defendant, including activities which may not have been charged in
2 | the information.  The Court is under no obligation to accept any recommendations made by the
3 | government, and the Court may in its discretion impose any sentence it deems appropriate up to and
4 | including the statutory maximum stated in this plea agreement.

5 |      If the Court should impose any sentence up to the maximum established by the statute, the
6 | defendant cannot, for that reason alone, withdraw her guilty plea, and she will remain bound to fulfill all
7 | of the obligations under this plea agreement.  The defendant understands that neither the prosecutor,
8 | defense counsel, nor the Court can make a binding prediction or promise regarding the sentence she will
9 | receive.

10 | **II.     DEFENDANT'S OBLIGATIONS**

11 | **A.     Guilty Plea.**

12 |      The defendant will plead guilty to Count 1, charging a violation of 18 U.S.C. § 1343 – Wire
13 | Fraud.  The defendant agrees that she is in fact guilty of these charges and that the facts set forth in the
14 | Factual Basis for Plea attached hereto as Exhibit A are accurate.

15 |      The defendant agrees that this plea agreement will be filed with the Court and become a part of
16 | the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw
17 | her plea(s) should the Court not follow the government's sentencing recommendations.

18 |      The defendant agrees that the statements made by her in signing this Agreement, including the
19 | factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by
20 | the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a
21 | guilty plea pursuant to this Agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f)
22 | and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this
23 | Agreement generally.

24 |      1.     Waiver of Indictment:

25 |      The defendant acknowledges that under the United States Constitution she is entitled to be
26 | indicted by a grand jury on the charges to which she is pleading guilty and that pursuant to
27 | Fed.R.Crim.P. 7(b) she agrees to waive any and all rights she has to being prosecuted by way of
28 | indictment to the charges set forth in the information.  The defendant agrees that at a time set by the

PLEA AGREEMENT        2

1  Court, she will sign a written waiver of prosecution by Indictment and consent to proceed by
2  Information rather than by Indictment.

3        **B.**    **Restitution.**

4        The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of
5  certain offenses.

6        Defendant agrees that her conduct is governed by the Mandatory Victim Restitution Act pursuant
7  to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims affected
8  by this offense, including, but not limited to, the victims covered in the factual basis and other victims as
9  a result of the defendant's conduct for the offenses charged from the periods of December 2017 through
10  November 2018.  The amount of restitution will be between approximately $472,000 and $600,000.

11        Defendant further agrees that she will not seek to discharge any restitution obligation or any part
12  of such obligation in any bankruptcy proceeding.

13        Defendant shall not sell, encumber, transfer, convey, or otherwise dispose of any of his assets
14  without prior written consent of the United States Attorney, except that the defendant may sell, transfer
15  or convey personal property (including used vehicles and personal items, but not financial instruments,
16  ownership interests in business entities or real property) with an aggregate value of less than $5,000.

17        Payment of restitution shall be by cashier's or certified check made payable to the Clerk of the
18  Court.

19        **C.**    **Fine.**

20        The defendant reserves the right to argue to Probation and at sentencing that she is unable to pay
21  a fine, and that no fine should be imposed.  The defendant understands that it is her burden to
22  affirmatively prove that she is unable to pay a fine, and agrees to provide a financial statement under
23  penalty of perjury to the Probation Officer and the government in advance of the issuance of the draft
24  Presentence Investigation Report, along with supporting documentation.  The government retains the
25  right to oppose the waiver of a fine.  If the Court imposes a fine, the defendant agrees to pay such fine if
26  and as ordered by the Court, up to the statutory maximum fine for the defendant's offense[s].

27

28

1   **D.      Special Assessment.**

2      The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering

3   a check or money order payable to the United States District Court to the United States Probation Office

4   immediately before the sentencing hearing.  The defendant understands that this plea agreement is

5   voidable at the option of the government if she fails to pay the assessment prior to that hearing.

6   **E.      Violation of Plea Agreement by Defendant/Withdrawal of Plea(s).**

7      If the defendant, cooperating or not, violates this plea agreement in any way, withdraws her plea,

8   or tries to withdraw her plea, this plea agreement is voidable at the option of the government.  If the

9   government elects to void the agreement based on the defendant's violation, the government will no

10  longer be bound by its representations to the defendant concerning the limits on criminal prosecution

11  and sentencing as set forth herein.  A defendant violates the plea agreement by committing any crime or

12  providing or procuring any statement or testimony which is knowingly false, misleading, or materially

13  incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct

14  constituting obstruction of justice.  Varying from stipulated Guidelines application or agreements

15  regarding arguments as to 18 United States Code section 3553, as set forth in this agreement, personally

16  or through counsel, also constitutes a violation of the plea agreement.  The government also shall have

17  the right (1) to prosecute the defendant on any of the counts to which she pleaded guilty; (2) to reinstate

18  any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that

19  would otherwise be barred by this plea agreement.  The defendant shall thereafter be subject to

20  prosecution for any federal criminal violation of which the government has knowledge.  The decision to

21  pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

22     By signing this plea agreement, the defendant agrees to waive any objections, motions, and

23  defenses that the defendant might have to the government's decision.  Any prosecutions that are not

24  time-barred by the applicable statute of limitations as of the date of this plea agreement may be

25  commenced in accordance with this paragraph, notwithstanding the expiration of the statute of

26  limitations between the signing of this plea agreement and the commencement of any such prosecutions.

27  The defendant agrees not to raise any objections based on the passage of time with respect to such

28  counts including, but not limited to, any statutes of limitation or any objections based on the Speedy

PLEA AGREEMENT                                            4

1   Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as
2   of the date of this plea agreement.  The determination of whether the defendant has violated the plea
3   agreement will be under a probable cause standard.

4          In addition, (1) all statements made by the defendant to the government or other designated law
5   enforcement agents (except for the interview conducted on April 2, 2021), or any testimony given by the
6   defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be
7   admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the
8   defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute,
9   Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or
10  any other federal rule, that statements made by the defendant before or after this plea agreement, or any
11  leads derived therefrom, should be suppressed.  By signing this plea agreement, the defendant waives
12  any and all rights in the foregoing respects.

13         **F.**     **Asset Disclosure.**

14         The defendant agrees to make a full and complete disclosure of her assets and financial
15  condition, and will complete the United States Attorney's Office's "Authorization to Release
16  Information" and "Financial Disclosure Statement" within three (3) weeks from the entry of the
17  defendant's change of plea, including supporting documentation.  The defendant also agrees to have the
18  Court enter an order to that effect.  The defendant understands that if she fails to complete truthfully and
19  provide the described documentation to the United States Attorney's Office within the allotted time, she
20  will be considered in violation of the agreement, and the government shall be entitled to the remedies set
21  forth in section II.E above.

22         Defendant expressly authorizes the United States to immediately obtain a credit report to
23  evaluate defendant's ability to satisfy any monetary penalty imposed by the court.  Defendant also
24  authorizes the U.S. Attorney's Office to inspect and copy all financial documents and information held
25  by the U.S. Probation Office.

26         **G.**     **Agreement to Cooperate.**

27         The defendant agrees to cooperate fully with the government and any other federal, state, or local
28  law enforcement agency, as directed by the government.  As used in this plea agreement, "cooperation"

PLEA AGREEMENT                                  5

1 | requires the defendant: (1) to respond truthfully and completely to all questions, whether in interviews,

2 | in correspondence, telephone conversations, before a grand jury, or at any trial or other court

3 | proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the

4 | defendant's presence is requested by the government or compelled by subpoena or court order; (3) to

5 | produce voluntarily any and all documents, records, or other tangible evidence requested by the

6 | government; (4) not to participate in any criminal activity while cooperating with the government; and

7 | (5) to disclose to the government the existence and status of all money, property, or assets, of any kind,

8 | derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal

9 | activities or the illegal activities of any conspirators.

10 | ### III.     THE GOVERNMENT'S OBLIGATIONS

11 | #### A.     Dismissals/Other Charges.

12 | The government agrees not to bring any other charges arising from the conduct outlined in the

13 | Factual Basis attached hereto as Exhibit A. The government also agrees not to reinstate any dismissed

14 | count except if this agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation

15 | of Plea Agreement by Defendant/Withdrawal of Plea(s)), III.B.3 (Reduction of Sentence for

16 | Cooperation), **Error! Reference source not found.** (Stipulated Guideline Calculation), and VII.B

17 | (Waiver of Appeal and Collateral Attack) herein.

18 | #### B.     Recommendations.

19 | 1.     Incarceration Range.

20 | The government will recommend that the defendant be sentenced at or below the low end

21 | of the applicable guideline range as determined by the Court.

22 | 2.     Acceptance of Responsibility.

23 | The government will recommend a two-level reduction (if the offense level is less than

24 | 16) or a three-level reduction (if the offense level reaches 16) in the computation of her offense level if

25 | the defendant clearly demonstrates acceptance of responsibility for her conduct as defined in U.S.S.G. §

26 | 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of

27 | the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging

28 | in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the

PLEA AGREEMENT                                        6

1   preparation of the pre-sentence report or during the sentencing proceeding.

2              3.     Reduction of Sentence for Cooperation.

3           The government agrees to recommend at the time of sentencing that the defendant's

4   sentence of imprisonment be reduced by up to 50% of the applicable guideline sentence if she provides

5   substantial assistance to the government, pursuant to U.S.S.G. § 5K1.1.  The defendant understands that

6   she must comply with paragraphs II.G and not violate this plea agreement as set forth in paragraph II.E

7   herein.  The defendant understands that it is within the sole and exclusive discretion of the government

8   to determine whether the defendant has provided substantial assistance.

9           The defendant understands that the government may recommend a reduction in her

10   sentence of less than 50% or no reduction at all; depending upon the level of assistance the government

11   determines that the defendant has provided.

12           The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a

13   recommendation and is not binding on the Court, that this plea agreement confers no right upon the

14   defendant to require that the government make a § 5K1.1 motion, and that this plea agreement confers

15   no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion.  In

16   particular, the defendant agrees not to try to file a motion to withdraw her guilty plea(s) based on the fact

17   that the government decides not to recommend a sentence reduction or recommends a sentence

18   reduction less than the defendant thinks is appropriate.

19           If the government determines that the defendant has provided further cooperation within

20   one year following sentencing, the government may move for a further reduction of her sentence

21   pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

22       **C.**    **Use of Information for Sentencing.**

23           The government is free to provide full and accurate information to the Court and Probation,

24   including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate

25   statements or arguments by the defendant, her attorney, Probation, or the Court.  The defendant also

26   understands and agrees that nothing in this Plea Agreement bars the government from defending on

27   appeal or collateral review any sentence that the Court may impose.

28

PLEA AGREEMENT           7

## IV.    ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following

elements of the offense(s) to which the defendant is pleading guilty, 18 U.S.C. § 1343 – Wire Fraud:

- First, the defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

- Second, the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

- Third, the defendant acted with the intent to defraud; that is, the intent to deceive and cheat; and

- Fourth, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

The defendant fully understands the nature and elements of the crimes charged in the information

to which she is pleading guilty, together with the possible defenses thereto, and has discussed them with

her attorney.

## V.    MAXIMUM SENTENCE

### A.    Maximum Penalty.

The maximum sentence that the Court can impose is 20 years of incarceration, a fine of $250,000

or twice the gross gain or gross loss, whiever is greater, a 3 year period of supervised release and a

special assessment of $100.  By signing this plea agreement, the defendant also agrees that the Court can

order the payment of restitution for the full loss caused by the defendant's wrongful conduct.  The

defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count(s)

to which she is pleading guilty.  The defendant further agrees, as noted above, that she will not attempt

to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B.    Violations of Supervised Release.

The defendant understands that if she violates a condition of supervised release at any time

during the term of supervised release, the Court may revoke the term of supervised release and require

the defendant to serve up to 2 additional years imprisonment.

## VI.     SENTENCING DETERMINATION

### A.     Statutory Authority.

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

### B.     Stipulations Affecting Guideline Calculation:

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

1.     **Base Offense Level**: The base offense level for the charge to which the defendant is pleading guilty is **7**. *See* U.S.S.G. § 2B1.1(a)(1).

2.     **Specific Offense Characteristics**:

a.     Twelve levels are added (**+12**) because the loss attributable to the defendant exceeded $250,000 (loss of approximately $472,717). U.S.S.G. § 2B1.1(b)(1)(G).

b.     Two levels are added (**+2**) because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. U.S.S.G. § 2B1.1(b)(10)(C).

c.     Two levels are added (**+2**) because the offense involved the trafficking of unauthorized access devices. U.S.S.G. § 2B1.1(b)(11)(B).

3.     **Preliminary Offense Level**: the parties anticipate that the preliminary offense level will be **23**.

4.     **Adjusted Offense Level**: The parties anticipate that the adjusted offense level will be **23**.

5.     **Acceptance of Responsibility**: See paragraph III.B.2 above

6.     **Criminal History**: The parties estimate, but do not stipulate, that the defendant's criminal history category will be I.

PLEA AGREEMENT                                              9

7. **Sentencing Range**:   The parties estimate, but do not stipulate, that the defendant's sentencing range will be **33-41 months**. (The defendant understands that if the criminal history category differs from the parties' estimate, her Guidelines sentencing range may differ from that set forth here.)

8.   Departures or Other Enhancements or Reductions:

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), departures, or cross-references, except that the government may move for a departure or an adjustment based on the defendant's cooperation (§5K1.1) or post-plea obstruction of justice (§3C1.1).

The defendant is free to recommend to the Court whatever sentence she believes is appropriate under 18 U.S.C. § 3553(a).  The government is not obligated to recommend any specific sentence but may not recommend a sentence above the low end of the guideline range as determined by the Court.

## VII.   WAIVERS

### A.   Waiver of Constitutional Rights.

The defendant understands that by pleading guilty she is waiving the following constitutional rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on her behalf; (f) to confront and cross-examine witnesses against her; and (g) not to be compelled to incriminate herself.

### B.   Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal her guilty plea, conviction, and sentence.  The defendant agrees as part of her plea(s), however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum for the offense to which she is pleading guilty.  The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts

1    attached to this agreement is insufficient to support the defendant's plea of guilty.  The defendant

2    specifically gives up the right to appeal any order of restitution the Court may impose.

3            Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if

4    one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the

5    statutory maximum; and/or (2) the government appeals the sentence in the case.  The defendant

6    understands that these circumstances occur infrequently and that in almost all cases this Agreement

7    constitutes a complete waiver of all appellate rights.

8            In addition, regardless of the sentence the defendant receives, the defendant also gives up any

9    right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any

10   aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

11           Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

12   attempts to vacate her plea(s), dismiss the underlying charges, or modify or set aside her sentence on any

13   of the counts to which she is pleading guilty, the government shall have the rights set forth in Section

14   II.E herein.

15           **C.      Waiver of Attorneys' Fees and Costs.**

16           The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

17   119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

18   investigation and prosecution of all charges in the above-captioned matter and of any related allegations

19   (including without limitation any charges to be dismissed pursuant to this plea agreement and any

20   charges previously dismissed).

21           **D.      Impact of Plea on Defendant's Immigration Status.**

22           Defendant recognizes that pleading guilty may have consequences with respect to her

23   immigration status if she is not a citizen of the United States.  Under federal law, a broad range of

24   crimes are removable offenses, including offense(s) to which the defendant is pleading guilty.  The

25   defendant and her counsel have discussed the fact that the charge to which the defendant is pleading

26   guilty is an aggravated felony, or a crime that is likely to be determined to be an aggravated felony under

27   8 USC § 1101(a)(43), and that while there may be arguments that defendant can raise in immigration

28   proceedings to avoid or delay removal, it is virtually certain that defendant will be removed if she is not

1 | a citizen of the United States.  Removal and other immigration consequences are the subject of a
2 | separate proceeding, however, and defendant understands that no one, including her attorney or the
3 | district court, can predict to a certainty the effect of her conviction on her immigration status.  Defendant
4 | nevertheless affirms that she wants to plead guilty regardless of any immigration consequences that her
5 | plea may entail, even if the consequence is her automatic removal from the United States.

6 |                                 VIII.      **ENTIRE PLEA AGREEMENT**

7 |          Other than this plea agreement, no agreement, understanding, promise, or condition between the
8 | government and the defendant exists, nor will such agreement, understanding, promise, or condition
9 | exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and
10 | counsel for the United States.

## IX.   APPROVALS AND SIGNATURES

### A.   Defense Counsel.

I have read this plea agreement and have discussed it fully with my client.  The plea agreement accurately and completely sets forth the entirety of the agreement.  I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: 4/21/2022

_____
ROBERT WILSON
Attorney for Defendant

### B.   Defendant:

I have read this plea agreement and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case.  No other promises or inducements have been made to me, other than those contained in this plea agreement.  In addition, no one has threatened or forced me in any way to enter into this plea agreement.  Finally, I am satisfied with the representation of my attorney in this case.

Dated: 4/21/2022

_____
YVONNE GAIDE
Defendant

### C.   Attorney for United States:

I accept and agree to this plea agreement on behalf of the government.

Dated:   April 21, 2022

PHILLIP A. TALBERT
United States Attorney

_____
MIRIAM R. HINMAN
CHRISTOPHER S. HALES
Assistant United States Attorneys

EXHIBIT "A"

Factual Basis for Plea

### A. Summary

Between about December 2017 and November 2018, Yvonne Gaide participated in a fraud scheme coordinated by Schenelle Flores, who used her employment at the Office of AIDS (OA), within the California Department of Public Health (CDPH), to divert money from that office. The scheme involved directing a state contractor, CORPORATION 1, to make payments allegedly on behalf of the Office of AIDS, and having CORPORATION 1 charge those payments to the state pursuant to a contract between CORPORATION 1 and CDPH. Flores and Gaide caused CORPORATION 1 to pay for personal expenses on its debit cards, order Visa gift cards for personal use, and pay invoices to shell companies linked to family members and friends. Gaide used the debit cards for at least approximately $19,217 in personal expenses. Gaide also obtained at least approximately 35 of the $100 Visa gift cards for her personal use. In addition, Gaide obtained thousands of dollars of the fraudulent proceeds that CORPORATION 1 paid to one of the shell companies, SOLE PROPRIETORSHIP 1. Christine Iwamoto set up SOLE PROPRIETORSHIP 1, used the fake name "Patricia Roberts" to communicate on behalf of that company, and requested that CORPORATION 1 pay SOLE PROPRIETORSHIP 1 for work allegedly being performed for OA. Iwamoto provided Gaide with cash and blank checks from the SOLE PROPRIETORSHIP 1 bank account, allowing Gaide to receive the fraudulent proceeds in a manner that concealed from OA and CORPORATION 1 the fact that Gaide was receiving some of the money paid to SOLE PROPRIETORSHIP 1. The total loss attributable to the scheme overall was at least approximately $2.7 million. The loss attributable to Gaide was at least approximately $472,717.

### B.  The Office of AIDS and Contract with CORPORATION 1

The Office of AIDS at the California Department of Public Health is responsible for working on behalf of the State of California to combat the HIV and AIDS epidemic, including providing supplies and services to local health jurisdictions. The Office of AIDS supports various programs aimed at preventing HIV infection in high-risk populations, as well as programs providing services to infected individuals. During the period of this scheme, CDPH had a contract with CORPORATION 1 to provide services to the Office of AIDS. Pursuant to the contract, CORPORATION 1 was supposed to distribute condoms and other harm reduction supplies. OA also used the contract as a clearinghouse contract, under which CORPORATION 1 would receive state funding to pay invoices to other contractors. The State of California paid CORPORATION 1 from the Federal Trust Fund.

Gaide was employed as an analyst by the Office of AIDS in Sacramento, California, through the time period of the scheme. Schenelle Flores was employed as a manager in the Office of AIDS in Sacramento, California, throughout the time period of the scheme. Iwamoto was employed by the Office of AIDS in Sacramento, California, until March 2018. Flores was the primary contact for CORPORATION 1 within the Office of AIDS. Flores provided direction to CORPORATION 1 about the activities that it should perform and the expenses that it should incur pursuant to the state contract. Gaide provided administrative support for the contract with CORPORATION 1 and engaged in frequent communications with its representatives. Individual 4 and Individual 5 were executives of CORPORATION 1, which operated in Coarsegold and then Fresno, California.

### C.  Payments to Shell Companies

Between approximately March 2018 and November 2018, Flores directed CORPORATION 1, through Individual 4 and Individual 5, to make payments to companies associated with her family and friends, based on false invoices claiming that the companies were doing work for the Office of AIDS. The false invoices that Flores submitted resulted in at least $1,476,000 in payments to the shell companies. CORPORATION 1 charged those payments to the state contract.

Iwamoto set up SOLE PROPRIETORSHIP 1. Iwamoto opened a bank account for SOLE PROPRIETORSHIP 1 and an email account for SOLE PROPRIETORSHIP 1. Flores coordinated with Iwamoto to submit invoices to CORPORATION 1 that falsely claimed SOLE PROPRIETORSHIP 1 was providing various consulting and meeting facilitation services to the Office of AIDS, when both Flores and Iwamoto knew that the claims about services being performed were false. The invoices also falsely claimed to be from a "Patricia Roberts," when in fact there was no person named Patricia Roberts associated with SOLE PROPRIETORSHIP 1. When Iwamoto used the email account to solicit payments to SOLE PROPRIETORSHIP 1, she also sent her messages under the name "Patricia Roberts." Iwamoto used the name Patricia Roberts to conceal her association with SOLE PROPRIETORSHIP 1. The invoices directed CORPORATION 1 to make payments to the bank account for SOLE PROPRIETORSHIP 1, which was controlled by Iwamoto. The bank account controlled by Iwamoto received a total of $450,000 from CORPORATION 1 as a result of the false invoices that were submitted.

Gaide participated in email exchanges about all of the payments from CORPORATION 1 to SOLE PROPRIETORSHIP 1 and knew that the payments to SOLE PROPRIETORSHIP 1 were being charged to the state contract despite the fact that SOLE PROPRIETORSHIP 1 was not performing any services for the Office of AIDS.

Iwamoto received $450,000 of proceeds from the wire fraud scheme in the bank account for SOLE PROPRIETORSHIP 1. Iwamoto and Gaide met in person for Iwamoto to give Gaide thousands of dollars in cash, including a single meeting at which Gaide received approximately $20,000 to $25,000 in cash. Gaide understood that the cash she received from Iwamoto came from the fraudulent payments that CORPORATION 1 made to SOLE PROPRIETORSHIP 1. By transferring the funds in cash, Iwamoto and Gaide purposely avoided creating any record of the fact that Gaide was the recipient. Iwamoto also provided Gaide with checks on the SOLE PROPRIETORSHIP 1 bank account that Iwamoto had signed but otherwise left blank. Admissible evidence would show that Gaide then filled out the rest of the checks and used them, thus obtaining another $29,090 in fraudulent proceeds from the scheme.

Flores also coordinated with other individuals to set up other shell companies and obtained payments from CORPORATION 1 to those other shell companies based on false claims about work performed for OA.

**D.   Gift Card Orders**

Between approximately December 2017 and August 2018, Flores directed CORPORATION 1 to order large batches of Visa gift cards that she falsely represented were for Office of AIDS programs, such as for patient incentives, when in fact they were for personal use by Flores, Iwamoto, and others. On several occasions, Flores directed CORPORATION 1 to provide the gift cards to Individual 1. Text messages show that Individual 1 urged Flores to obtain the gift cards from CORPORATION 1, picked up batches of the gift cards from CORPORATION 1, and coordinated with Flores to distribute some of the gift cards to family and friends. While Iwamoto was still an employee of OA, she communicated with Individual 1 about picking up the gift cards from CORPORATION 1 and directed him to claim that he was the "mail carrier" for OA. Flores and Individual 1 obtained at least 1,250 $100 gift cards from CORPORATION 1 for personal use by themselves and their family and friends, including Gaide. Gaide received at least approximately 35 of those $100 Visa gift cards for her personal use. CORPORATION 1 charged the gift card orders to the state contract.

**E.   Personal Debit Card Use**

Between approximately February 2018 and November 2018, Flores and Gaide used debit cards belonging to CORPORATION 1 for a variety of personal purchases. Email messages show that Individual 5 gave Flores his CORPORATION 1 debit card information so that OA could use CORPORATION 1 as a clearinghouse for purchases. Email messages also show that Flores shared the debit card information with Individual 1. Flores, Individual 1, Gaide, and others obtained at least

$459,000 worth of items and cash for personal use with the debit cards for CORPORATION 1. Gaide obtained at least approximately $19,217 of items for her personal use with the debit cards, including purchases from Disneyland, Universal Studios, Ruth's Chris Steakhouse, and assorted apparel and home decorating items. Despite their knowledge of the personal nature of many of Flores's and Gaide's purchases, Individual 4 and Individual 5 charged them to the state contract.

Gaide exchanged text messages with Individual 5 about the fact that Flores was making so many personal purchases on the debit cards and about specific personal purchases that Gaide was making on the debit cards. In August 2018, Individual 5 wrote to Gaide, "What the hell does Schenelle buy at Taget?" Gaide wrote, "Lmao," and "I'm gonna get a part time job there. Bahaha." Individual 5 responded, "We may both need to. It's like you and I are sitting in a car in front of a bank that just got robbed. They jump in our car and we drive off. Maybe a little dramatic, but seriously…Target!" Then Individual 5 wrote, "Oh shit, if that's your charge…I take that all back." Then Individual 5 and Gaide discussed charges that Gaide was attempting, Individual 5 suggested that Flores would classify a lot of expenses under a travel and meal money line item, and Gaide wrote, "I'll try Ruth's."

F.    **Invoices to the State of California and Total Loss**

Individual 4 submitted invoices to the Office of AIDS for amounts allegedly owed to CORPORATION 1. The invoices falsely claimed and promised that the total expense amounts listed were for HIV prevention services and that the amounts were owed to CORPORATION 1 pursuant to the contract for services to the Office of AIDS. As described above, Individual 4 and Individual 5 were actually charging numerous personal expenses for Flores, Iwamoto, Gaide, and others to the state contract, including expenses that Individual 4 and Individual 5 knew were personal expenses. Gaide understood that CORPORATION 1 was charging the payments made to SOLE PROPRIETORSHIP 1, the personal debit card purchases, and the Visa gift cards as expenses on the OA contract. Flores and Gaide repeatedly processed the invoices from CORPORATION 1, and Flores repeatedly signed her approval of payment, despite their knowledge that a substantial part of the requested state funding was actually being used for personal purposes. Based on the false invoices, the State of California paid CORPORATION 1 from the Federal Trust Fund.

The total loss from the scheme that Flores organized was at least approximately $2.7 million. The total loss attributable to Gaide is approximately $472,717, consisting of the items that Gaide personally received and the proceeds sent to SOLE PROPRIETORSHIP 1, from which Gaide received a substantial cut.

G.    **Interstate Wires**

Executing the scheme involved numerous interstate wire communications, including wires of money and wire transmissions required for other monetary transactions, such as deposits of checks. Iwamoto, who was located in the Sacramento area, requested payments to SOLE PROPRIETORSHIP 1, provided the bank account information for CORPORATION 1 to send the money, and received the wires from CORPORATION 1 into the bank account for SOLE PROPRIETORSHIP 1. With respect to Count 1 of the information, on May 28, 2018, Iwamoto requested that CORPORATION 1 pay $70,000 to SOLE PROPRIETORSHIP 1 based on an invoice claiming that SOLE PROPRIETORSHIP 1 was providing five in-person, four-hour meetings at the OA downtown Sacramento office on specified dates, when Iwamoto knew that SOLE PROPRIETORSHIP 1 was not providing any of the claimed services and had not provided any of the services claimed on previous invoices. Flores emailed the invoice requesting a $70,000 payment to Individual 4 and Individual 5, copying Gaide. Individual 5 and Gaide, who was also located in the Sacrament area, had an email exchange about confirming the set of payments that had been made and should be made to SOLE PROPRIETORSHIP 1. On May 30, 2018, $70,000 was wired from CORPORATION 1's J.P. Morgan Chase bank account ending #2567 to SOLE PROPRIETORSHIP 1's Bank of America account ending #9782. The wire was an interstate wire operated by the FedWire service, using servers in both New Jersey and Texas.

1                                        *****

2        I, Yvonne Gaide, have carefully reviewed the above Exhibit A:  Factual Basis for Plea with my
3   attorney.  As far as my own conduct is concerned, the facts described above are true, and I adopt this
    Factual Basis for Plea as my own true statement.
4
        Dated: 4/21/2022                          Yvonne Gaide
5
6                                                  YVONNE GAIDE, Defendant
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    PLEA AGREEMENT                        A-4